2025 IL App (1st) 211454

First District
Third Division
March 6, 2025

No. 1-21-1454

|                                              |     |                                |
| -------------------------------------------- | --- | ------------------------------ |
|                                              | )   |                                |
| THE PEOPLE OF THE STATE OF ILLINOIS,         | )   | Appeal from the Circuit Court  |
|                                              | )   | of Cook County.                |
|     Plaintiff-Appellee,  | )   |                                |
|                                              | )   | No. 97 CR 12501                |
| v.                                           | )   |                                |
|                                              | )   | The Honorable                  |
| MIGUEL DELEON,                               | )   | Gregory Paul Vasquez,          |
|                                              | )   | Judge Presiding.               |
|     Defendant-Appellant. | )   |                                |
|                                              | )   |                                |

JUSTICE REYES delivered the judgment of the court, with opinion.
Justices Martin and D.B. Walker concurred in the judgment and opinion.

**OPINION**

¶ 1      In 1998, following a bench trial, 17-year-old defendant Miguel Deleon was convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 1996)) and attempted first degree murder (*id.* §§ 8-4, 9-1(a)(1)) and was sentenced to a mandatory life term for the murder and a consecutive 30-year term for the attempted murder. The statute providing for the mandatory life term, however, was later found unconstitutional, and defendant was consequently resentenced, receiving an extended-term 100-year sentence for the murder in addition to the consecutive 30-year term for the attempted murder. After the United States Supreme Court issued its decision in *Miller v. Alabama*, 567 U.S. 460 (2012), defendant's sentence was again vacated, and the trial court was ordered to conduct a new sentencing hearing in light of the principles concerning juvenile culpability set forth in *Miller*. Defendant was ultimately resentenced to a 60-year term for the murder and a consecutive 20-year term for the attempted murder. Defendant now appeals, contending that his sentence is unconstitutional, as it violates the

eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution. Alternatively, defendant claims that, even if his sentence is constitutional, it is nevertheless excessive where the trial court failed to properly consider the mitigating factors concerning his youth. For the reasons set forth below, we affirm.

¶ 2                                            BACKGROUND

¶ 3                                        *Trial and Prior Appeals*

¶ 4        As noted, in 1998, defendant was convicted of first degree murder and attempted first degree murder after a bench trial. The evidence at trial established the following, as set forth by our supreme court in one of defendant's prior appeals (see *People v. Deleon*, 227 Ill. 2d 322, 325-27 (2008)).

¶ 5        Defendant was a member of the Imperial Gangsters, a rival gang of the Latin Kings. On the afternoon of April 4, 1997, defendant met with some of his fellow gang members in "the Jungle," a neighborhood located near the intersection of Mannheim Road and Crown Road in Franklin Park. Defendant was providing "security" for the Imperial Gangsters that day, which meant he carried a firearm in the event of an altercation with the Latin Kings. At some point, defendant and his cohorts noticed a red Ford Mustang driving westward on Crown Road. As the vehicle bore a Stone Park registration sticker and contained a "crown air freshener," the Imperial Gangsters surmised that it belonged to a Latin King. When someone yelled "flakes," a term meaning "rival gang member," defendant and another Imperial Gangster ran through an apartment complex to intercept the Mustang on Schiller Street. When the Mustang appeared on Schiller Street, defendant and one of his fellow gang members stepped into the street and stopped the vehicle. An altercation ensued, and, from a distance of three feet, defendant fired two shots through the driver's side windshield. One of those shots hit the driver, Jose Sanchez,

in the chest. Sanchez sped away toward Mannheim Road, passing an ice cream truck surrounded by children. Defendant continued firing at Sanchez, and seven-year-old Juana Nieto, who was standing beside the ice cream truck, was shot and killed. A three-year-old boy and the ice cream truck driver also sustained injuries.

¶ 6    The trial court found defendant guilty of the first degree murder of Nieto and the attempted first degree murder of Sanchez. At the same time, the trial court acquitted defendant of the attempted first degree murders of the three-year-old boy and the ice cream truck driver, both of whom sustained wounds during the shooting. Following a sentencing hearing, the trial court imposed a mandatory life term for the first degree murder conviction, based on the fact that defendant was 17 years old at the time of the offense and the victim was under the age of 12. See 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1996). For the attempted first degree murder conviction, the trial court imposed a consecutive sentence of 30 years in prison. See *id.* § 5-8-4(a).

¶ 7    Defendant appealed, challenging the sufficiency of the evidence, and this court affirmed. See *People v. DeLeon*,[1] No. 1-99-0028 (2000) (unpublished order under Illinois Supreme Court Rule 23). Defendant then filed a *pro se* postconviction petition challenging the constitutionality of his mandatory life sentence, based on the Illinois Supreme Court's decision in *People v. Wooters*, 188 Ill. 2d 500 (1999), which invalidated the public act enacting the relevant sentencing provision. The trial court summarily dismissed the petition, but we reversed on appeal, finding that *Wooters* required defendant's sentence to be vacated, and

---

[1]We note that defendant's last name is alternatively spelled both as "DeLeon" and as "Deleon." We adopt the spelling used in his appellate brief.

3

remanded the matter to the trial court for resentencing. See *People v. DeLeon*, No. 1-01-2469 (2003) (unpublished order under Illinois Supreme Court Rule 23).

¶ 8        Following a resentencing hearing, the trial court found that there was sufficient evidence presented at trial to support an extended-term sentence based on the victim's age at the time of her murder. Accordingly, the trial court sentenced defendant to a 100-year term for the murder, in addition to the previously-imposed consecutive 30-year term for the attempted murder, which it did not revisit on resentencing. Defendant appealed, and we affirmed. See *People v. DeLeon*, No. 1-04-2934 (2006) (unpublished order under Illinois Supreme Court Rule 23). Defendant appealed the appellate decision to the Illinois Supreme Court, which affirmed the appellate court judgment. See *Deleon*, 227 Ill. 2d 322.

¶ 9        Defendant filed another *pro se* postconviction petition in 2008, which was denied, followed by a motion for leave to file a successive postconviction petition, which was similarly denied. Defendant appealed the latter order, and we granted the State Appellate Defender's motion for leave to withdraw as counsel pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987), and affirmed the trial court's denial of defendant's motion. See *People v. DeLeon*, No. 1-09-0561 (2010) (unpublished order under Illinois Supreme Court Rule 23).

¶ 10       In 2014, defendant again sought leave to file a successive postconviction petition, arguing that his 130-year sentence violated the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution, based on the United States Supreme Court's decision in *Miller*. The trial court granted defendant leave to file his successive postconviction petition and defendant was appointed counsel. The State moved to dismiss the petition, claiming that *Miller* did not apply to the case, as defendant was not

sentenced to a mandatory life sentence. The trial court granted the State's motion to dismiss, and defendant appealed.

¶ 11    On appeal, we found that the Illinois Supreme Court's recent decision in *People v. Holman*, 2017 IL 120655, instructed that the rationale of *Miller* applied to discretionary sentences of life without parole for juvenile defendants.[2] We further determined that the record did not demonstrate that the trial court had made a finding that defendant was permanently incorrigible or that it had considered defendant's youth or its attendant characteristics, as required by *Miller*. We accordingly found that we were required to vacate defendant's sentence and remand for resentencing. See *People v. Deleon*, 2018 IL App (1st) 153253-U.

¶ 12                                   *Resentencing Hearing*

¶ 13    Following remand, the trial court conducted a new sentencing hearing on October 7, 2021. At the hearing, the parties stipulated that defendant had received five major disciplinary tickets between 1999 and 2006.[3] The parties further stipulated that, in 2015, defendant received another two major disciplinary tickets for an incident in which defendant was attempting to manipulate another inmate into conducting a staff assault. According to the investigation conducted by the prison, defendant was a "known member" of the Imperial Gangsters and "acts as their family representative." As such, when defendant felt that another inmate had violated the Imperial Gangsters' laws, he "gave the inmate the ultimatum to assault staff, be the target of an assault, or check into protective custody." Finally, the parties stipulated that, in 2017, defendant received a major ticket for gang-related actions, which determined that

---

[2]We note that the Illinois Supreme Court subsequently overruled *Holman* in *People v. Wilson*, 2023 IL 127666, ¶ 42, in light of the United States Supreme Court's further clarification of the *Miller* analysis in *Jones v. Mississippi*, 593 U.S. 98 (2021).

[3]The parties additionally stipulated that defendant received disciplinary tickets in 2018 and 2019, but the stipulation does not indicate whether these were major tickets.

defendant had elected to hold the leadership position of the "Latin Folk Assistant Institutional Coordinator" with the Latin Folk street gang. One of the consequences of this ticket was the revocation of two months of good-time credit.

¶ 14    With respect to defendant's criminal history, the parties stipulated that defendant had two prior juvenile adjudications for aggravated assault and battery, both in 1995, for which his sentences of probation were satisfactorily terminated.

¶ 15    The parties additionally presented witness testimony concerning mitigation and aggravation. The State presented a victim impact statement from Nieto's sister on behalf of her family, as well as testimony from a representative of the Illinois Department of Corrections, who testified that an inmate would be able to reclaim lost good-time credit through good behavior. In mitigation, the defense called Helen Skinner, an attorney working as a private mitigation specialist. Skinner testified that she had prepared a mitigation report with respect to defendant's resentencing, which the trial court admitted into evidence.

¶ 16    In the report, Skinner related that defendant had a troubled childhood, with a mother who was only 14 years old at the time of his birth and a stepfather who was abusive, both of whom also abused drugs and alcohol. Defendant's biological father was not involved in his life after his stepfather objected to his presence, and defendant and his older brother were raised in fear of their stepfather. Defendant's stepfather encouraged defendant to fight and, after defendant began junior high, his uncle introduced him to gang life, which involved violence and drugs. Defendant eventually joined the Imperial Gangsters gang, where he was known as "Scrappy" for his willingness to fight.

¶ 17    Skinner's report further indicated that, after his incarceration, defendant turned his life around, earning his GED, completing certificate programs, and successfully engaging in

6

several employment opportunities, rising to the level of becoming a barber and working alongside the institutional staff. Defendant also sought treatment for his mental health, including meeting with a psychiatrist and participating in support groups. Defendant additionally converted to Islam.

¶ 18    In addition to Skinner's testimony and report, defendant gave a statement in allocution, which he primarily directed to Nieto's family, expressing his remorse for the crime.

¶ 19    Finally, a presentence investigation report (PSI) revealed that defendant reported that he was raised by his mother and, later, stepfather, and was close with both. His father had little involvement in defendant's life, but defendant used drugs with him from an early age. Defendant reported that he "did not have a good childhood" and did not have a stable home life, as they moved frequently. He indicated that, while his stepfather provided food and shelter, he also physically and emotionally abused defendant. Defendant ran away from home, but "would always return." It was only during his years in prison that defendant had become close to his stepfather. In the PSI, defendant's mother confirmed that her husband "was very strict and could be abusive." She further reported that she was " 'young and a mess' " when her children were young and that defendant had " 'been through a lot.' "

¶ 20    Defendant reported that he had graduated from high school in Northlake, despite being expelled for fighting during his sophomore year, and was an "average" student who did not have a relationship with his teachers or other students. He also obtained a GED while in prison and completed several certificate programs while incarcerated. Prior to his arrest, he had been employed at a fast food restaurant for several months.

¶ 21    Defendant reported that he had been involved with the Imperial Gangsters from the age of 16 to 20, but denied any current gang involvement. He indicated that he felt pressure to become

involved with gang activity and was " 'mislead [*sic*], while looking for a father figure' " at a time when his maturity level was " 'very low.' " He also engaged in gang activities due to the " 'consequences' " he would experience if he did not.

¶ 22    Defendant began taking psychotropic medication in 2017, while suffering with depression, anxiety, and sleep issues, and currently was prescribed medication to help him sleep. He reported beginning to drink alcohol from age 9 or 10, and drank daily. Defendant reported that alcohol caused problems in his family and with legal issues, and he believed that alcohol and drugs played a " 'huge' " role in the current offense. Defendant also reported using drugs at a very early age, beginning with the use of marijuana with his father at approximately eight years old; this activity led to his mother and stepfather stopping visits with his father. Defendant also used cocaine and LSD on a regular basis beginning at the age of 12.

¶ 23    Defendant reported that he "takes no pride in any criminal behavior" and was concerned about others' problems. With respect to the current offense, defendant reported that " 'he has a ton of remorse and daily wishes he could take it back,' " further reporting that " 'he is haunted daily and he wishes he could go back and trade places with the victim's families.' "[4]

¶ 24    After the parties had presented evidence and argument in mitigation and aggravation, the trial court indicated that it would not be making an immediate sentencing decision in order to give the matter proper consideration. On November 9, 2021, the parties came before the trial court for its ruling, in which it ultimately resentenced defendant to 60 years for the first degree murder and a consecutive 20 years for the attempted murder. The trial court informed the parties that "[e]very day I thought about this case," examining defendant's exhibits "a lot,"

---

[4]In addition to the updated PSI, defendant's two previous PSIs were also admitted into evidence, as were the trial transcript and the transcripts from his prior sentencing hearings.

while also considering "the other side," namely, what it would be like to have a child or grandchild killed while buying ice cream. The trial court indicated that it had considered defendant's age, impetuosity, and level of maturity at the time of the offense, including his ability to appreciate the risks and consequences of his actions and the presence of any cognitive or developmental disabilities. The trial court further indicated that it had considered whether defendant had been subjected to outside pressure, which had been argued by the defense, and considered defendant's family, home environment, and social and educational background, including any history of parental neglect, physical abuse, or other childhood trauma. The trial court observed that "[i]t's the rare case where we have someone who doesn't have that in their background. But nonetheless, I did think about it." The trial court also stated that it considered defendant's potential for rehabilitation, noting that "generally speaking, most defendants probably do have the potential for rehabilitation." Finally, the trial court indicated that it had considered the circumstances of the offense, but "didn't dwell on how horrible it would have been to be out there on that day."

¶ 25        The trial court stated that it "gave a lot of thought to this defendant's degree of participation and his specific role in the offense," as well as whether there was any planning by defendant, "even though it may not have been the best thought out plan for an offense." The trial court also considered whether defendant was meaningfully able to participate in his defense and "didn't see any evidence that he wasn't." The trial court additionally considered defendant's prior criminal history.

¶ 26        The trial court noted that it had considered defendant's statement in allocution, but observed that "on a bare, cold transcript it might appear to have more remorse than I was perceiving by the defendant's demeanor in court. *** I was not impressed by his performance

on his right of allocation [*sic*] or his statement of regret." The trial court accepted that defendant had not intended to kill Nieto, but noted that the intended victim—Sanchez—was not mentioned in defendant's statement. Although the trial court indicated that it was not "holding it against the defendant that he didn't mention" Sanchez, it nevertheless observed that the fact that there was a second—intended—victim who had sustained a severe bodily injury "can influence a sentence." Accordingly, the trial court sentenced defendant to 60 years for the murder and a consecutive 20 years for the attempted murder.

¶ 27    Defendant filed a motion to reconsider sentence, which was denied, and this appeal follows.

¶ 28                                    ANALYSIS

¶ 29    On appeal, defendant primarily contends that his 80-year sentence violates both the United States and Illinois Constitutions. As can be observed from the procedural posture of this case, the law underlying the applicable sentencing scheme has shifted substantially since 1998, when defendant was initially sentenced. More specifically, as relevant to the instant appeal, the law concerning the sentencing of juveniles has undergone dramatic changes, even since the time of defendant's resentencing hearing.[5] Accordingly, we begin with an overview of the legal landscape surrounding the matter.

---

[5]The United States Supreme Court issued its decision in *Jones*, 593 U.S. 98, on April 22, 2021, which was several months prior to defendant's resentencing hearing on October 7, 2021. The parties, however, did not discuss *Jones*—or its possible impact—during the hearing. Moreover, the Illinois Supreme Court's decision in *Wilson*, 2023 IL 127666, which more directly impacted the *Miller* analysis as relevant to defendant's case, was not issued until approximately 18 months after defendant's resentencing.

¶ 30                    *Juvenile Sentencing and the Eighth Amendment*

¶ 31          Beginning in 2005, the United States Supreme Court issued a series of decisions in which it recognized that "children are constitutionally different from adults for purposes of sentencing" with respect to the eighth amendment of the United States Constitution. *Miller*, 567 U.S. at 471. In *Roper v. Simmons*, 543 U.S. 551, 568 (2005), the Supreme Court held that the eighth amendment prohibited the imposition of the death penalty for juvenile offenders under the age of 18. Subsequently, in *Graham v. Florida*, 560 U.S. 48, 74 (2010), the Supreme Court similarly held that the eighth amendment prohibited a minor from being sentenced to life without parole for a nonhomicide offense. Two years later, in *Miller*, the United States Supreme Court expanded that decision, finding that the eighth amendment to the federal constitution "forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders," even in homicide cases. *Miller*, 567 U.S. at 479.

¶ 32          These cases relied on three "significant gaps" between juveniles and adults. *Id.* at 471. First, juveniles lack maturity and have an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and risk-taking. *Id.* Second, juveniles are vulnerable to negative influences and outside pressures, including from their families and peers, owing to their limited control over their environment and inability to extricate themselves from negative settings. *Id.* Finally, a juvenile's nature is less " 'well formed' " than an adult's, meaning that "his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].' " *Id.* (quoting *Roper*, 543 U.S. at 570). Thus, in *Miller*, the Supreme Court found that mandatory sentences of life without parole were impermissible, as "[s]uch mandatory penalties, by their nature, preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it." *Id.* at 476. While the *Miller* Court expressly

11

left open the possibility of a trial court imposing a sentence of life without parole for a juvenile offender in homicide cases, the Supreme Court instructed that "we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480.

¶ 33       As a result of the decision in *Miller*, the Illinois legislature enacted section 5-4.5-105 of the Unified Code of Corrections (730 ILCS 5/5-4.5-105 (West 2016)), which imposed a new sentencing scheme for defendants who were under the age of 18 when they committed their offenses. Under the statute, the sentencing court is required to consider a number of "additional factors in mitigation" before sentencing any such defendant. *Id.* § 5-4.5-105(a). The legislature subsequently also enacted a statute providing for parole review with respect to offenses committed by defendants who were under the age of 21. See 730 ILCS 5/5-4.5-115 (West 2020).

¶ 34       In *Montgomery v. Louisiana*, 577 U.S. 190, 206 (2016), the Supreme Court found that *Miller* "announced a substantive rule that is retroactive in cases on collateral review." In doing so, the *Montgomery* Court explained that *Miller* "did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of 'the distinctive attributes of youth.' " *Id.* at 208 (quoting *Miller*, 567 U.S. at 472). As such, "[e]ven if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects unfortunate yet transient immaturity." (Internal quotation marks omitted.) *Id.* The *Montgomery* Court further reiterated that "*Miller*, it is true, did not bar a punishment for all juvenile offenders, as the Court did in *Roper* or

*Graham*. *Miller* did bar life without parole, however, for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Id.* at 209.

¶ 35     In *Holman*, based in part on the analysis in *Montgomery*, the Illinois Supreme Court interpreted *Miller* to apply to discretionary life sentences in addition to mandatory life sentences, finding that "*Miller* contains language that is significantly broader than its core holding" (*Holman*, 2017 IL 120655, ¶ 38), as "[n]one of what the Court said is specific to only mandatory life sentences" (*id.*). Specifically, our supreme court found that "a juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. The court may make that decision only after considering the defendant's youth and its attendant characteristics." *Id.* ¶ 46. Additionally, while our supreme court had previously found that a "mandatory term-of-years sentence that cannot be served in one lifetime" was the functional equivalent of a mandatory sentence of life without parole for purposes of the *Miller* analysis (*People v. Reyes*, 2016 IL 119271, ¶ 9), our supreme court later clarified that a sentence of over 40 years operated as a *de facto* life sentence, which triggered the protections of *Miller* (*People v. Buffer*, 2019 IL 122327, ¶ 41). Accordingly, under Illinois law, "to prevail on a claim based on *Miller* and its progeny, a defendant sentenced for an offense committed while a juvenile must show that (1) the defendant was subject to a life sentence, mandatory or discretionary, natural or *de facto*, and (2) the sentencing court failed to consider youth and its attendant circumstances in imposing the sentence." *Id.* ¶ 27. It was this law which governed defendant's resentencing in the case at bar.

¶ 36    In 2021, however, the United States Supreme Court issued its decision in *Jones v. Mississippi*, 593 U.S. 98, 105 (2021), in which it made clear that *Miller* applied only to mandatory—not discretionary—life sentences and that "[i]n a case involving an individual who was under 18 when he or she committed a homicide, a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient." The *Jones* Court also clarified that the trial court was not required to make a finding of permanent incorrigibility before sentencing a juvenile homicide offender to life without parole. *Id.* at 106. The Supreme Court noted that, in *Miller*, it had stated that a discretionary sentencing procedure "would itself help make life-without-parole sentences 'relatively rar[e]' for murderers under 18." *Id.* at 112 (quoting *Miller*, 567 U.S. at 484 n.10). The *Jones* Court further observed that "if the sentencer has discretion to consider the defendant's youth, the sentencer necessarily *will* consider the defendant's youth, especially if defense counsel advances an argument based on the defendant's youth." (Emphasis in original.) *Id.* at 114. Thus, the Supreme Court rejected any requirement of a finding of permanent incorrigibility, either implicit or explicit, before a trial court could sentence a juvenile homicide offender to life without parole. *Id.* at 113, 118.

¶ 37    In light of *Jones*, the Illinois Supreme Court subsequently overruled its decision in *Holman*, finding that its requirement that the trial court make a finding of permanent incorrigibility was directly at odds with the holding in *Jones*. *People v. Wilson*, 2023 IL 127666, ¶ 42.

¶ 38                              *Applicability of* Miller

¶ 39    In the instant case, defendant contends that his 80-year sentence was unconstitutional, where it did not comport with the requirements of *Miller*. As an initial matter, however, we must consider the State's claims that defendant does not fall under the protections of *Miller*. The State maintains that *Miller* is inapplicable where (1) defendant's sentence was

discretionary, not mandatory; (2) defendant is eligible for good-time credit, which renders his sentence effectively a 40-year sentence; and (3) defendant is eligible for parole, which provides for an opportunity for release prior to serving a *de facto* life sentence.[6] We agree.

¶ 40    First, the State correctly observes that defendant's sentence was discretionary, not mandatory. Defendant was subject to a sentencing range of 20 to 60 years for the first degree murder (730 ILCS 5/5-4.5-20(a) (West 2020))[7] and 6 to 30 years for the attempted first degree murder (*id.* § 5-4.5-25(a)). Accordingly, defendant's possible aggregate sentence ranged from a minimum of 26 years to a maximum of 90 years. Both the United States Supreme Court and the Illinois Supreme Court have made it clear that *Miller* applies only to *mandatory* sentences of life without parole. See *Jones*, 593 U.S. at 105; *Wilson*, 2023 IL 127666, ¶ 38; see also *People v. Clark*, 2023 IL 127273, ¶ 71 ("In *Jones*, *** the Court clarified that the holding in *Miller* does not apply to discretionary life sentences where the sentencing court does have discretion to consider youth and attendant characteristics at sentencing."). Indeed, in *Jones*, the United States Supreme Court expressly held that "[i]n a case involving an individual who was under 18 when he or she committed a homicide, a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient." *Jones*, 593 U.S. at 105. Here, the sentencing range applicable to defendant's offenses would have permitted the trial court to

---

[6]The State also claims that defendant's sentence is not a *de facto* life sentence because the Illinois Department of Corrections website indicates that he will be released on August 5, 2033, which is less than 40 years after his "custody date" of November 25, 1996. We reject this argument, however, as defendant correctly observes that there is no information as to how this date is calculated. Indeed, our own search of the Illinois Department of Corrections website reveals that it now lists defendant's "Projected Parole Date" as June 15, 2033, suggesting that the date has changed since the State visited the website, further demonstrating the uncertainty as to the date's calculation. See *Internet Inmate Status*, Ill. Dep't of Corr., https://www.idoc.state.il.us/subsections/search/inms_print.asp?idoc=K69997 (last visited Feb. 27, 2025) [https://perma.cc/CCE3-DBRH].

[7]We note that defendant was eligible for an extended-term sentence, as Nieto was under the age of 12 at the time of her death (see 730 ILCS 5/5-8-2, 5-5-3.2(b)(3)(i) (West 2020)), but the State did not seek an extended-term sentence, nor did the trial court impose one.

sentence defendant to a term of less than 40 years—*i.e.*, less than a *de facto* life sentence. See *Buffer*, 2019 IL 122327, ¶ 41. As the trial court had the discretion to sentence defendant to a term that did not constitute a *de facto* life sentence, we cannot find that defendant's sentencing was subject to the protections of *Miller*. See *People v. Anderson*, 2024 IL App (1st) 220864, ¶ 12; *People v. Merriweather*, 2022 IL App (4th) 210498, ¶ 32 ("Under *Jones* and Illinois law, as long as the trial court considers the factors set forth in section 5-4.5-105(a) in exercising its discretion, it may sentence a juvenile offender to a prison term greater than 40 years and not violate the eighth amendment.").

¶ 41    We find unpersuasive defendant's contention that the fact that the trial court observed that "most defendants probably do have the potential for rehabilitation" means that *Wilson* and *Jones* are "not controlling" and that defendant "was categorically precluded from receiving a life sentence without a meaningful chance of parole." First, the trial court's comment was made when it was "generally speaking" and was not necessarily a finding that *this defendant* had the potential for rehabilitation such that imposition of an 80-year sentence was impermissible. Additionally, the *Jones* Court made clear that "[t]he key assumption of both *Miller* and *Montgomery* was that discretionary sentencing allows the sentencer to consider the defendant's youth, and thereby helps ensure that life-without-parole sentences are imposed only in cases where that sentence is appropriate in light of the defendant's age." *Jones*, 593 U.S. at 111-12. While the *Jones* Court recognized that different factfinders could weigh the defendant's youth differently, it nevertheless found that "the key point remains that, in a case involving a murderer under 18, a sentencer cannot avoid considering the defendant's youth if the sentencer has discretion to consider that mitigating factor." *Id.* at 115. Thus, "unless a sentencing court 'expressly refuses as a matter of law to consider the defendant's youth (as opposed to, for

example, deeming the defendant's youth to be outweighed by other factors or deeming the defendant's youth to be an insufficient reason to support a lesser sentence under the facts of the case)' [citation], a discretionary sentencing scheme, in itself, satisfies *Miller*'s requirement that sentencing courts account for youth and its attendant circumstances." *Wilson*, 2023 IL 127666, ¶ 38. Here, we cannot find that the trial court's general reference to one of the mitigating factors indicates that the trial court refused, as a matter of law, to consider defendant's youth or otherwise "categorically precluded" defendant from receiving an 80-year sentence.

¶ 42     Next, the State correctly observes that the availability of good-time credit means that defendant's 80-year sentence is effectively a 40-year sentence, which is not a *de facto* life sentence for purposes of *Miller*. See *Buffer*, 2019 IL 122327, ¶ 41. Our supreme court has instructed that, in considering whether a statutory scheme provides the opportunity for release short of a *de facto* life sentence, the availability of good-time credit is relevant. See *People v. Dorsey*, 2021 IL 123010, ¶ 49. Under section 3-6-3(a)(2.1) of the Unified Code of Corrections (730 ILCS 5/3-6-3(a)(2.1) (West 2020)), defendant is eligible for one day of sentence credit for each day of his imprisonment. Accordingly, defendant's 80-year sentence, with good-time credit, is effectively a 40-year sentence and he therefore does not fall within the protections of *Miller*. See *People v. Thompson*, 2022 IL App (1st) 200463, ¶ 38.

¶ 43     We do not find persuasive defendant's contention that his sentence remains a *de facto* life sentence since he previously had two months of good-time credit revoked. First, defendant has the ability to regain any lost good-time credit. See 730 ILCS 5/3-3-2(b), 3-6-3(c) (West 2020). More importantly, our supreme court has instructed that "[i]t is the *sentencing scheme* that must afford a youthful offender a realistic opportunity for release" (emphasis in original)

17

(*Dorsey*, 2021 IL 123010, ¶ 58), not the amount of credit actually earned. Thus, in *Dorsey*, the supreme court found:

> "From our review of the Illinois good-conduct scheme, it is clear that defendant (1) must be awarded day-for-day credit, (2) is entitled to keep it as long as it is not revoked because he commits a disciplinary offense, (3) is afforded procedures that protect against arbitrary revocation of credit, and (4) may enforce constitutional protections through judicial review. That the Department of Corrections may determine—after adhering to the foregoing due-process procedures—that defendant's misconduct in prison may warrant revocation of previously awarded credit does not alter that the legislature provided him a meaningful opportunity to demonstrate rehabilitation and obtain release before he spends more than 40 years in prison." *Id.* ¶ 61.

Similarly, here, the fact that defendant may or may not have sentencing credits revoked has no bearing on the fact that the applicable sentencing scheme allows him a meaningful opportunity to obtain release after 40 years.

¶ 44    Finally, the State contends that the availability of parole removes defendant's case from the protections of *Miller*. As noted, in 2019, the legislature enacted a statute providing for parole review with respect to offenses committed by defendants who were under the age of 21. See 730 ILCS 5/5-4.5-115 (West 2020). With respect to defendants who were convicted of first degree murder, the statute provides for two opportunities for parole, one after 20 years of incarceration, and then one 10 years later. *Id.* § 5-4.5-115(b), (m).

¶ 45    The United States Supreme Court has expressly indicated that "[a] State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather

than by resentencing them." *Montgomery*, 577 U.S. at 212. Such an option "ensures that juveniles whose crimes reflect[ ] only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment." *Id.* Moreover, the Illinois Supreme Court in *Dorsey* drew an analogy between good-time credit and the availability of parole in determining that the latter provided a meaningful opportunity for a juvenile offender's release. See *Dorsey*, 2021 IL 123010, ¶ 53 ("flatly reject[ing]" the notion that "good-conduct credit is not like parole because obeying prison rules does not demonstrate rehabilitation"). As such, nearly all of the appellate courts that have considered the matter have concluded that the availability of parole under section 5-4.5-115 renders *Miller* inapplicable. See, *e.g.*, *People v. Cavazos*, 2023 IL App (2d) 220066, ¶ 60; *People v. Kendrick*, 2023 IL App (3d) 200127, ¶ 43; *People v. Elliott*, 2022 IL App (1st) 192294, ¶ 56; *People v. Beck*, 2021 IL App (5th) 200252, ¶ 26. But see *People v. Gates*, 2023 IL App (1st) 211422, ¶¶ 38-49 (finding *de facto* life sentence, despite availability of parole under section 5-4.5-115).

¶ 46    Defendant, however, contends that section 5-4.5-115 does not provide him a meaningful opportunity for release, as he is entitled to only two requests for parole, 10 years apart, before being precluded from ever seeking parole in the future. He therefore claims that the theoretical availability of parole does not remove his case from the protections of *Miller*. We note that this issue is presently pending before the Illinois Supreme Court, which will presumably resolve the matter. See *People v. Spencer*, 2023 IL App (1st) 200646-U, *appeal allowed*, No. 130015 (Ill. Nov. 29, 2023). As we agree with the State's previous arguments concerning the applicability of *Miller*, we have no need to opine as to whether the presence of section 5-4.5-115 affects the nature of defendant's sentences for purposes of the *Miller* analysis.

¶ 47                          *Defendant's* Miller-*Compliant Sentencing*

¶ 48          Despite our conclusion that *Miller* is inapplicable to defendant's sentencing, we
nevertheless find that the trial court in the instant case complied with its requirements in
resentencing defendant. As noted, after the decision in *Miller*, the legislature enacted section
5-4.5-105 of the Unified Code of Corrections, which requires a sentencing court to consider a
list of specific factors prior to sentencing any defendant under the age of 18. These factors are
similar to those identified by the *Miller* Court as relevant to the matter of juvenile sentencing.
See *Holman*, 2017 IL 120655, ¶ 45 (noting that section 5-4.5-105 "requires the trial court to
consider factors taken from the Supreme Court's list"); *People v. Clark*, 2024 IL 127838, ¶ 73
(the "clear purpose" of section 5-4.5-105(a) is "to require courts sentencing juvenile offenders
to consider the many differences between juvenile offenders and adults").

¶ 49          Specifically, section 5-4.5-105(a) requires a sentencing court to consider the following
factors in mitigation:

>          "(1) the person's age, impetuosity, and level of maturity at the time of the offense,
> including the ability to consider risks and consequences of behavior, and the presence
> of cognitive or developmental disability, or both, if any;
>
>          (2) whether the person was subjected to outside pressure, including peer pressure,
> familial pressure, or negative influences;
>
>          (3) the person's family, home environment, educational and social background,
> including any history of parental neglect, physical abuse, or other childhood trauma;
>
>          (4) the person's potential for rehabilitation or evidence of rehabilitation, or both;
>
>          (5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel[,] chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." 730 ILCS 5/5-4.5-105(a) (West 2020).[8]

¶ 50     In addition to the presence of the above statutory factors, the trial court in this case would have been exceptionally aware of the necessity of considering defendant's youth and its attendant characteristics by virtue of the procedural posture of the litigation. The matter came before the trial court for resentencing *specifically* due to the necessity of considering the *Miller* factors—based on the law at the time, we found in our prior decision that the trial court that had imposed defendant's 130-year sentence "made no finding that [defendant] was permanently incorrigible and did not consider the factors set forth in *Miller* and *Holman*." *Deleon*, 2018 IL App (1st) 153253-U, ¶ 33. Accordingly, we vacated defendant's prior sentence and remanded for resentencing "in accordance with section 5-4.5-105 of the Code." *Id.* ¶ 36. The trial court was therefore informed that its resentencing needed to include consideration of defendant's youth. As a result, in sentencing defendant, the trial court expressly considered each of the above sentencing factors prior to sentencing defendant to a total of 80 years.

---

[8]We note that section 5-4.5-105(a) has since been amended to include several additional factors. See Pub. Act 103-191, § 10 (eff. Jan. 1, 2024) (amending 730 ILCS 5/5-4.5-105).

¶ 51     In this case, then, defendant was sentenced under a sentencing scheme that gave the trial court discretion to consider defendant's youth, and the record reveals that the trial court did not refuse, as a matter of law, to consider defendant's youth but did, in fact, consider defendant's youth and its attendant characteristics, as set forth in section 5-4.5-105(a). We accordingly cannot find that defendant's sentence was unconstitutional under the eighth amendment of the United States Constitution. See *Wilson*, 2023 IL 127666, ¶ 44.

¶ 52     We similarly cannot find that defendant's sentence violates the proportionate penalties clause of the Illinois Constitution. The proportionate penalties clause requires that all penalties "be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Among other circumstances, a defendant's sentence violates the proportionate penalties clause where "the penalty imposed is 'cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community.' " *Clark*, 2023 IL 127273, ¶ 51 (quoting *People v. Miller*, 202 Ill. 2d 328, 338 (2002) (*Leon Miller*)). There is no specific definition of a "cruel" or "degrading" sentence, as the "moral sense" of the community changes over time, in light of evolving standards of decency and fairness. *Id.* The proportionate penalties clause, however, is broader than the protections of the eighth amendment. See *People v. Clemons*, 2012 IL 107821, ¶¶ 39-40.

¶ 53     Defendant's argument on this point consists of challenging the youth parole statute, contending that it is "widely inconsistent" with those of other states, as well as being "inconsistent with Illinois's *own* trend in recent changes that have been made in the way juveniles are tried and sentenced in Illinois" (emphasis in original). Whether or not defendant has a meaningful opportunity for parole, however, does not determine whether defendant's

sentence violated the proportionate penalties clause in this case. Here, defendant received a discretionary sentence of 80 years—which, after good-time credit, is less than a *de facto* life sentence—after the trial court expressly considered the statutory factors in mitigation. This sentence was well-supported by the record, as we explain further below, and we therefore cannot find that defendant's sentence violated the proportionate penalties clause of the Illinois Constitution.

¶ 54                                                                    *Excessive Sentence*

¶ 55      Finally, defendant argues in the alternative that, even if his sentence was not unconstitutional, it was nevertheless excessive. "Illinois courts have long recognized that the imposition of a sentence is left to the sound discretion of the trial court and will not be altered upon review absent an abuse of that discretion." *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 15. The trial court's sentence is given great deference, as "the trial court is in the best position to consider the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *Id.*

¶ 56      As noted, in sentencing a defendant, the trial court is required to consider factors in aggravation and mitigation, including the specific factors listed in section 5-4.5-105(a), when the defendant is under the age of 18. Not all mitigating factors apply in all cases, and "the trial court need not articulate each factor it considers in rendering the sentence for a juvenile offender." *Merriweather*, 2022 IL App (4th) 210498, ¶ 31. In determining whether the trial court based its sentence on appropriate aggravating and mitigating factors, " 'a court of review should consider the record as a whole, rather than focusing on a few words or statements by the trial court.' " *Id.* (quoting *People v. Dowding*, 388 Ill. App. 3d 936, 943 (2009)).

¶ 57      In this case, the trial court was presented with a great deal of evidence at the sentencing hearing. Specifically, the State presented a victim impact statement from Nieto's sister on behalf of her family, as well as testimony from a representative of the Illinois Department of Corrections regarding the opportunity for defendant to regain his previously revoked good-time credit. The parties also stipulated as to defendant's disciplinary record while incarcerated, which included several tickets related to gang activity, as well as defendant's limited criminal history prior to the instant offense. In mitigation, the defense presented the testimony of mitigation specialist Helen Skinner, as well as her mitigation report, which related defendant's troubled childhood and his behavior since being incarcerated. Defendant also made a statement of allocution, expressing remorse for the crime. Finally, the trial court was also presented with defendant's PSI, which encompassed much of the same detail as in the mitigation report.

¶ 58      After the parties presented their evidence and made arguments in aggravation and mitigation, the trial court adjourned the proceedings. Before rendering its decision, the trial court explained that "one of the reasons I didn't go right to sentencing right after the last word was uttered by the defense is because I wanted time to think about this." The trial court further informed the parties that "[e]very day I thought about this case." The trial court then listed each of the statutory factors in turn and expressly stated that it had considered each factor. With respect to defendant's statement in allocution, the trial court noted that it had considered it, but observed that "on a bare, cold transcript it might appear to have more remorse than I was perceiving by the defendant's demeanor in court. *** I was not impressed by his performance on his right of allocation [*sic*] or his statement of regret." It then sentenced defendant to 60 years for the murder and 20 years for the attempted murder.

¶ 59      We cannot find that this sentence represented an abuse of the trial court's discretion. Despite defendant's contention, the sentencing proceedings were not "brief." The trial court conducted a full resentencing hearing, then adjourned specifically for the purpose of processing all of the information presented at that hearing before determining an appropriate sentence. While the trial court did not set forth its reasoning as to each factor in detail, it was not required to do so, and its decision not to do so does not indicate a lack of consideration. See *Merriweather*, 2022 IL App (4th) 210498, ¶ 31 ("[T]he trial court need not articulate each factor it considers in rendering the sentence for a juvenile offender, and that omission does not mean the trial court did not consider all relevant factors."). Defendant in this case is clearly unhappy with the balancing of the factors by the trial court and believes that his mitigating evidence should have been afforded more weight. It is not our purview, however, to reweigh the evidence on appeal, as the trial court was in a better position to determine an appropriate sentence based on the particular facts and circumstances. See *id.* ¶ 32. Here, the trial court's determination that an 80-year sentence was warranted fell squarely within the sentencing range and was amply supported by the evidence. We therefore cannot find that the trial court's sentence was excessive.

¶ 60                                    CONCLUSION

¶ 61      For the reasons set forth above, we affirm the judgment of the trial court. Defendant's sentence does not violate the eighth amendment of the United States Constitution or the proportionate penalties clause of the Illinois Constitution, nor was the sentence excessive.

¶ 62      Affirmed.

***People v. Deleon*, 2025 IL App (1st) 211454**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 97-CR-12501; the Hon. Gregory Paul Vasquez, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Stephen L. Gentry, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Su Wang, and David H. Iskowich, Assistant State's Attorneys, of counsel), for the People. |